should be the mixed question of law and fact, applying the clearly erroneous standard. In Carpetland, the Supreme Court said that this standard of review is appropriate for all appeals of administrative agencies. Now, it has not been applied to workers' comp cases, but I've found no reason why it shouldn't be. It provides that the court can set aside a decision if it comes to the firm conviction a mistake's been made. Once you have the historical facts established and the rule of law is undisputed, the issue becomes, do the facts taken as a whole satisfy the statutory standard? In this case, the historical facts are established. The employee was working as a punch press operator. He had a five-day history of shortness of breath, which is a symptom of congestive heart failure, and edema, which were the things that were diagnosed when he got to the emergency room. That day, he was assigned to use a very small snowblower, which he testified he could push with one hand. After a few hours, he felt an increase in these symptoms, the shortness of breath, and asked for help. An ambulance was called. At that time, he was found to be alert and oriented. He gave the history of five days of symptoms worsening since last p.m. He had no numbness or tingling in his extremities or any other sign of stroke. He arrives at the emergency room about a half an hour later and gives the same history of shortness of breath for five days. He's able to move all extremities. He's diagnosed with pulmonary edema, respiratory distress.  An echocardiogram is done, which found an unusual finding, a myxoma, which is a benign tumor growing in his left atrium. In fact, it was quite large. It was filling the entire cavity. This was blocking blood flow intermittently and was causing the pulmonary edema and the heart failure. It looked sort of like a polyp, maybe like this microphone. You have a thin pedicle attached to the heart with a ball at the end of it. The ball keeps growing as does the length of the pedicle, and it flows back and forth. The tumor had been growing for at least five years, according to all of the testimony. The echocardiogram indicated that the tumor had split and was prolapsing against the valve. He was taken to surgery that same day, was put on cardiac bypass for the open-heart surgery, and then the surgeon found that the echocardiogram was not accurate. I should say the echocardiogram is not in evidence, so all we have is the second-hand description in the operative report. But he said it was not attached where he expected. It was not at the atrial septum. It was at the posterior wall. And he describes no split. He describes taking out a single tumor. He cut the tumor at the heart wall, right at the bottom, what he calls the button, and removes it and finds no fragments, finds no other evidence of tissue. There's no description of what he takes out. It can be torn or rough as it would be if something had broken off. And he sends it to pathology. He also notes that after he seals up the heart, there's still bleeding going on. He's able to seal it from the outside, but even after having cleaned out the heart, there's bleeding going on into the heart from the wound. Counsel, let me ask you this that ties back into your initial argument that this is a de novo review. There's no dispute. The parties agree there was a preexisting condition not caused by the employment of this benign tumor, correct? Correct. Isn't there a dispute as to what effect his work-related activities had on this condition and the resulting condition and well-being? Isn't there some dispute over the implications of that tumor vis-à-vis the resulting condition? Or is that all agreed upon? Well, I think the facts that were agreed upon by everyone are that he had no symptoms of stroke until after he woke up after surgery. There's no finding in the ambulance, the emergency room, or the hospital of any of this until after. So we can say that we agree. Their own experts said that if something breaks off and you have an embolism, it's immediate. You know it because you have hemiparesis. And he didn't have that. So, yeah, we do know some facts that we all agree on. And some of you don't agree on. Well, what we don't agree on would be that this condition of disability that he has is related to anything that happened at work. That's where we have the question. So why wouldn't that be a manifest way of review? Because we have the fact, the medical facts, the historical facts I think are all agreed upon as to what medically happened to him that day. What we don't have agreements on is what does that mean? Does that mean a rising out of it? If you have a preexisting condition for which surgery is necessary, the surgery is performed, and the surgery leads to a disability. All right, so you're saying different inferences can be drawn from this evidence. Can they not by the commission? I don't think that you can draw any fair inference that there was a stroke caused by the snowblower because it didn't happen prior to him going to sleep. The only inference that would be drawn from the evidence would be that the stroke occurred during the surgery. So the question is, what brought him to surgery? And what brought him to surgery was the preexisting condition. He had a myxoma that had to be removed that was filling the entire chamber of his heart. And the only treatment for his surgery. What did the arbitrator believe, Dr. Telenor? The arbitrator made several factual findings that are not in the evidence, from which he then said they support Dr. Tuano. And he did not consider the fact that the PATH report, he never mentions it, found a single lobulated mass. It found no cut, nothing broken off. There was no evidence of anything having come out of the tumor. There's no tear, there's no jagged surface. And that's an examination under a microscope by a pathologist. And that is something that he does not consider. And yet he was the only expert that had specialized training, education, and clinical experience in the area of cardiology. Is that not also correct? That would be correct, but this is not a cardiology case. This is a surgery case. This is a surgery case. What happened to him happened during surgery. We know that because it didn't happen before. He didn't have any of the signs and symptoms until after. He's not an expert in surgery. We know that because he said that you wouldn't send the whole tumor to the pathologist. You'd only send a little bit of it because, you know, that's all that they need. So he's saying the commission has no legal basis for relying on Telenor's opinions? I think that they were relying — well, first, they rely on things that even Telenor didn't say. Telenor didn't go as far as the commission went. But under this standard that I want to suggest to the Court, you can say that there is some evidence. It's just not going to be evidence that taken as a whole meets the intermediate standard of mixed question of one path. It's applied in other administrative proceedings. I mean, after surgery, the condition is considerably different. That's when he has the CT scan that shows he had a stroke, that he had an embolic showering. After that, the only cause of opinion from any treating doctor is from Dr. Roth at the Rehab Institute, who says that he went into surgery for a tumor, and he came out of the surgery hemiparetic. That what he was being treated for at the Rehab Institute was a postoperative tumor. That's what you get from a treating doctor. Dr. Solano is not a treating doctor. He's not even an examining doctor. He's a records reviewer 13 years later. And he does not — his opinions are not consistent with the known and established facts from the treaters. The question that's presented is if the disability is the result of the stroke, which is pretty much agreed, and the stroke is the result of the surgery, and the surgery is the result of the tumor, where's the causal connection to the work? The commission found causal connection based on facts that were not in evidence. The commission found that he had brain damage before he arrived at the hospital. It was evidenced by his inability to use his four extremities. That's not in the record. He had full use of the four extremities in the ambulance and in the emergency room until he was put to sleep. The commission found that the movement of the tumor caused it to split and break up with a portion remaining attached to the heart as evidenced by the operative report and CT scan. They say no such thing. The operative report found no split, no fragments. And the pathologist found no rough edge, which would have been necessary if something had torn. You tear a dollar bill in half, you've got two rough edges. Even if one is gone, you can still see the other one. And the CT was done three days after surgery, so it showed what happened during the surgery. It doesn't show anything from before. So the only causal opinion that they rely on from Dr. Talano is inconsistent with all the known historical facts. I'm sorry. Inconsistent with the known historical facts. You know, reiterate, he's not a surgeon. It's a surgery case. He's not a pathologist. And he's saying the pathologist must have missed something. You know, they didn't send the whole thing to him. He's not a neurologist. He doesn't treat people post-stroke like Dr. Roth. What does he say? He says the tumor fragmented during snowblowing and half of it broke off. Where did it go? He said, well, on the same day. There's no half a tumor found in his heart. It's not found anywhere. It doesn't exist. If that happened, he would have had a stroke at the time. He would have had signs and symptoms. He didn't. This opinion just can't be reconciled with any of the known historical facts. An embolism causes immediate symptoms, and he didn't have them. There's no torn edge. There's no evidence of anything coming off because it's not there when the heart is opened up. He came up with a speculation that the surgeon only sent part of the tumor to pathology. That's inconsistent with the hospital policy that's in the evidence and the testimony that that's the policy of every hospital. If you have a tumor and this part of it is cancerous and this part isn't, and you cut it in half, you may end up sending the wrong half. It just wouldn't be done, ever. When you say this is a surgical case, you're just saying that, what? That's when the injury occurred. I mean, it had to have occurred during the surgery because he didn't have the signs and symptoms before the surgery, and he had them after. So we know the time when it occurred, and it's testified that's a known complication of bypass surgery. You take someone out of circulation. You put them on a heart-lung machine. You do surgery in the heart. You restart the system. If there's any kind of a blood clot or debris that gets to the brain, this is what's going to happen. And it's a known complication. It's a blood clot. But you can also have a restricted blood flow that can cause the same effect, can you not or not? No. To the brain. No. This is the infarcts, which is the debris that breaks apart and goes to different parts of the brain. That's only caused by an embolism, by something moving from the heart to the brain. So a restricted blood flow doesn't create anything. Not the finding that they had. It could create loss of oxygen, generalized damage. What they found was specific damage in specific places caused by the embolisms. That was what was the finding on the CT three days after surgery. Can they actually find an embolism? I'm sorry? Can they actually find an embolism? You know, that's a good question. They could find proof that there was an embolism because the brain dies in five seconds. Right. That's all they can do. Right. But they can't, like, find that little fragment. I would not know. No. All I know is what they said, which is that they said the CT scans showed that there was an embolic showering of fragments. Whether they're findable, whether you'd operate on the brain to do it, I just don't know. But we do know that that's a separate phenomenon from oxygen deprivation due to, you know, congestive heart failure. They're two separate things. He ended up hemiparetic because of this fragment going to the part of the brain that affected his left side. I'll have time on rebuttal, counsel. Okay. Thank you. Counsel, please. Please, the Court. Steve Seidman on behalf of Mr. White. I'm not quite getting it. For 17 years, I quite haven't gotten it. There are many questions of fact that exist here. This case is replete with questions of fact. For instance, Dr. Mitsos, their expert, was found to be incredible. Literally, those words were used by both the commission in adopting the arbitrator's opinion as well as the circuit court, who hadn't looked at a case or practiced in 10 years, who was a kept man, so to speak, for the respondent, who did consulting work only, who was a vascular person at one time in his life. He says that there was no strenuous activity in snowblowing for this particular individual or shoveling. This particular person was a tool and die maker who was put into service, so to speak, on a very heavy snow day, was meant to go shovel. He was instructed to go shovel and snowplow or snowblow with a small snowblower this area. He started at 11 p.m. and he worked until this occurred at about 5 in the morning. He had not done this before. He was not conditioned for it. And in essence, what Dr. Mitsos says is, this is not strenuous activity. And in fact, it was strenuous activity, as noted by the only thing that Mr. White did remember, previous to when he, so to speak, went into distress, is that he had worked. There was a lot of snow. It was heavy work. He remembers that he got very short of breath, lost feelings in the extremities, both left, right arm, legs, both legs, and went to go tell his supervisor when he passed out and remembers nothing else because he has mental deficits at this particular point. At the outset, I must tell you this idea that he was short of breath for weeks or for days. He had, as the evidence discloses and is in the record, he had had pneumonia or strep throat. He was on antibiotics for it. And that was the history that he gave when he came in. He was sick. He was certainly well enough to work the complete day. It had no previous problems relating this to atrial myxoma. And other than the doctor, are there other factual disputes which would mean this would be a manifest weight case? Yes. For instance, the operative report, which counsel notes, Dr. Murphy says the echocardiogram showed that the myxoma had split through its center, allowing it to prolapse the mitral valve. For instance, as counsel pointed out, the day after, they did a CAT scan, which showed an embolic showering of these clots throughout the body, the showering. Well, counsel says that they only took out the entire tumor, or benign tumor was in the heart valve, and they took it out, the surgeon took it out, but he didn't give the entire, according to what he says, Dr. Tolano said it's okay not to give the entire tumor. In fact, he did give the entire tumor. The rest of it had split, and it caused embolic showering. If, as counsel says, if this happened during surgery or after surgery, and if this embolic showering, which was disclosed the day after surgery existed, how did that happen? Because the entire, whatever was left in the body was taken out and was given to pathology. Half of it, or about half of it, some part of it had split off and embolized. There's a very big disagreement as to that, because they say that the entire tumor was in the outflow valve. For instance, their experts contend that, number one, Dr. Buckingham, their first expert, testified that this exertional effort only helps an atrial myxoma, which is sophistry, according to everybody else. There's a dispute as to what, whether, and when this particular event occurred. And by that I mean this is a two-phase process. One, phase one is Dr. Tolano testifies, who was chief of Northwestern's cardiology before he moved to Tulane, and was chief of cardiology there, who's had 13 of these cases himself, and who's a very well-credentialed and knowledgeable person. Where did he move to? He moved to Tulane, New Orleans. You're saying so fast. I'm sorry. Just follow up a little bit. Sorry. It's all that coffee I had today, and all those nerves. But he moved to New Orleans, and he became chief there when his deposition was taken. But what he says occurs as two processes. One, the benign tumor, and it is something like this particular microphone, as you have exertional events, the myxoma pops off, goes into the inflow valve, blocks it, causes anoxia. That's number one of brain damage. However, at the same time, because there's continuing pressure, to use a plumbing example, there's continuing pressure coming into this blocked space, one of two things happens almost immediately. A, it either breaks up or it goes down into the inflow valve. In this particular case, it embolized. In other words, there are some fiber parts that break away and then becomes embolized throughout the system. And that's exactly what Dr. Tulano says here. And we get into factual questions. While you're on that. Yes. Proposing counsel emphasized very heavily that the commission came up with findings that were not based on evidence in the record. I.e., that they went beyond Tulano's testimony. What do you make of that argument? They didn't go beyond Tulano's testimony. In fact, if anything, they relied on it and adopted it, but they did not go beyond it. In fact, they testified. I'll tell you what, they did opine quite considerably and critically of their experts, saying that it didn't make the timeline and went to their credibility. We didn't come up with any findings that were inconsistent with Tulano or went beyond Tulano. They absolutely did not. Yes. And, in fact, in this two-phase process, one, the inflow anoxia at the same time the embolization occurs. And at one point, I moved to supplement the record, which was denied without prejudice, found out that this was in the record. I don't have the site, the appellate site I certainly could get to, but this is from Midsos. And the question asked to him was, so your theory on causation or your opinion on causation is essentially traced back to that first part, which is the tumor didn't move over the mitral valve because of exertion of energy. Is that correct? Answer, that's correct. Hypothetically, if the tumor moved over the mitral valve as part of an exertion energy, then would you agree with me that the embolic stroke that ensued, in your opinion, during surgery would then be causally related to the exertion? Is that correct? Answer, it would be a complication of a causally related procedure. So, in essence, this factual dispute, Judge Justice, that there was no exertional event from all these hours of snowblowing and this deconditioned man existed as one of the many examples. And if you look at it the way I look at this case, it's really there was a case Schwartz versus the Industrial Commission decided in 2005 by this court. And at that point, this is really with a different result exactly what Schwartz is. These are experts of which the court has a right to rely on, the arbitrator had a right to rely on, and the commission had a right to rely on, and their opinions will not be disturbed because of the manifest weight of the evidence standard. And I would contend respectfully that the reason that they want this de novo look is really to hope that this manifest weight standard would get around it, but the bottom line is that this was a decision that the arbitrator ruled, the commission ruled, and the circuit court ruled affirmatively and with quite amount of bravado. All three of those did. So, in essence, although I could go on about the science of this thing, the factual nature and the factual disputes that exist here, the manifest weight of this evidence lie with the petitioner, Mr. White, and with the decisions of the commission and the circuit court. Thank you. Thank you. Counsel Rebuttal, please. Thank you. The findings of the commission that I identified don't appear anywhere in the record that I can find. And I don't know why it said they're there. If you point it out, fine, but there's nothing in any of the records that talks about him having brain damage prior to getting to the hospital. All the neurologic exams are normal until he's put to sleep. The commission decision has to be supported by the record, not by speculation or conjecture. This idea that something broke off when there's no evidence it did, and all the evidence says nothing did break off because there's no rough edge. You don't have a tear. I mean, what did it do? Heal miraculously so that even a pathologist under a microscope couldn't find a torn edge? The only edge you could find was a cut edge from the surgeon? I mean, that just belies belief. In first cash, this Court overturned a commission decision based on adopting speculation as to there being debris on the floor. They said there's no testimony there was debris on the floor. If someone fell, they better have some basis for saying that there was debris. It's equally possible there was debris or there was not debris. So even though the commission ruled in favor of the claimant, this Court overturned it as being contrary to law. This falls in the same category. I mean, they're claiming that there must have been some debris in the heart from this tumor that went to the brain. Where is it? Where's the evidence of it? There is none, and all the evidence says that it's impossible. Because if it had happened, there would have been signs and symptoms, and if it had been found, it would have been in the operative report. If the snowblowing caused the tumor to break up, no sign and symptom. Therefore, it couldn't have happened at that time. How would both the surgeon and the pathologist miss it? The CT scan three days later shows that we know when it happened. It happened during the surgery. He went to sleep with full use of his arms and legs, and he woke up with partial paralysis. Was the snowblowing an exertion? Well, it's very similar to what you had in Schwartz and Ephraimides. In Ephraimides, the guy is erecting scaffolding, but it's not an extraordinary physical effort, because he's a physical laborer, and that was found not to arise out of his work. In Schwartz, the guy is driving a truck cross-country from Chicago to California, and that was found not to arise out of it. Counsel said that he was deconditioned. I don't know where that comes from. It's certainly not in the record. I mean, the only thing in the record is that he worked every day as a factory worker. He was 27 years old, and he had an active life outside of that. He bowled. Pushing a snowblower that he himself said was easy, is not an extraordinary physical exertion. But it wouldn't really matter, because we know why he had the surgery that caused his disability. He had the surgery because he unfortunately had a tumor in his heart that was blocking blood flow and had to be removed, and that's what it comes down to. Having been at work is what saved his life, because he got to the hospital and they were able to give him life-saving treatment. He didn't develop congestive heart failure and pulmonary edema in five hours. That was obviously something that was developing over time, consistent with the five days of symptoms. It wasn't caused by a cold. A cold doesn't cause congestive heart failure and pulmonary edema. And how does a tumor get broken up into such tiny pieces that it can go through the tiny blood vessels to the brain? It doesn't make any sense. What makes sense is that some blood clotted and got through and caused this. That's the only thing that would make any sense consistent with the known facts. Thank you. Thank you. Clerk, we'll take the matter under advisement for disposition.